# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**ROGER D. ISBEL,**
    **PLAINTIFF**

**CASE NO. 1:06-CV-384**
**(WATSON, J.)**
**(HOGAN, M.J.)**

**VS.**

## COMMISSIONER OF SOCIAL
## SECURITY,
    **DEFENDANT**

## REPORT AND RECOMMENDATION

Plaintiff filed his application for disability insurance benefits (DIB) and supplemental security income (SSI) in April, 2003. He alleged an onset date of October 12, 2000. Plaintiff's applications were denied, both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) at Cincinnati, Ohio on May 3, 2005. At the hearing, Plaintiff, who was represented by counsel, testified as did Vocational Expert (VE), Miche Daoud. Following an unfavorable decision in September, 2005, Plaintiff processed an appeal to the Appeals Council, who refused review in April, 2006. Plaintiff then filed his Complaint with this Court in June, 2006, and sought judicial review of the final order of the Defendant Commissioner denying him benefits.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ erred in several respects. He first argues that the ALJ gave undue weight to the reports of other physicians and insufficient weight to the opinion of Dr. Kathleen Yang. Plaintiff's second argument is that the ALJ erred in evaluating his credibility and subjective reports of pain. Third, Plaintiff contends that the ALJ erred by failing to include functional limitations or accommodations relating to Plaintiff's depression. Fourth, Plaintiff argues that the ALJ erred in formulating his residual functional capacity assessment and hypothetical question by not including the days Plaintiff would miss work because of his impairments.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff stated he was 47 years old, 6'1" and 215 lbs., right-handed and single. He holds a GED and lives with his mother and brother. Plaintiff's last employment was at Marmer's Orthotics as an orthotic fabricator, a job he held from November, 1994 to October 12, 2000 and had to give up because of low back pain, despite an accommodating schedule. Prior employment was as a landscape supervisor with Perpetual Maintenance and Landscaping from April, 1989, to July, 1990.

Plaintiff testified that an injury to the L4-5 discs resulted in four surgeries in 1990, 1995, 1996 and 1997, respectively. The 1990 and 1995 surgeries were laminectomies. In 1996, a fusion was done along with a insertion of a stimulator for bone growth. The stimulator dislodged and was removed in 1997. Plaintiff

2

also stated that he has pancreatitis, which causes left side, but manageable, pain.
He described his low back pain as radiating from the right low back, through the
buttocks, down the leg to the toes. He also said that he has peripheral neuropathy,
which causes pain in both legs between the calf and the toes, and also has a
problem with vomiting and diarrhea, which occurs every 2-3 weeks and lasts for
2-3 days. (Tr., Pgs. 48-56). The cause of the stomach and intestinal problems is
the pancreatitis.

His primary care physician is Dr. Kathleen Yang, whose maiden name was
Harlow. He stated that the peripheral neuropathy was diagnosed by Dr. Lester
Duplechan at the Mayfield Clinic and that Dr. Duplechan recommended that he
consult the Pain Clinic, which provided treatment to Plaintiff in the early 1990s.
He takes Morphine and wears two Duragesic patches.

Plaintiff testified that he could lift 20 lbs., but not without pain, and could
stand for 15-20 minutes at a time and sit for approximately 20 minutes. He
estimated that he could walk about 15-20 minutes. He also admitted to being
depressed, to overdosing on Darvoset in October, 2007 and ending up at Emerson
North Hospital for mental health treatment. He currently takes antidepressants and
describes his depression as "not as bad" as it was in the early 1990s. Crying spells
and suicidal ideation have ceased. Other psychiatric treatment was at Jewish
Hospital. Plaintiff said that he has difficulty concentrating and remembering as
well as controlling anger.

Plaintiff stated that he smokes a pack per day, but denies alcohol use after
being told that his "pancreatitis was from drinking." He seldom reads, but watches
television. He is able to groom himself, cook with the microwave and do laundry.
(Tr., Pgs. 56-71).

3

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's hypothetical question to the VE assumed an individual who has the residual functional capacity to lift, carry, push and pull 10 lbs. frequently, can stand and/or walk for a total of 2 hours, and up to 30 minutes at a time, can sit for a total of 8 hours, but must be able to change positions every 2-3 minutes, can occasionally stoop, kneel, crouch, twist and climb ramps and stairs. The hypothetical individual cannot crawl, balance or climb ladders, ropes or scaffolds. The hypothetical individual cannot operate motor equipment or hazardous machinery and cannot work at unprotected heights. Lastly, the hypothetical individual is unable to remember or carry out detailed instructions. The VE responded that there would be a representative number of sedentary and unskilled jobs which Plaintiff could perform. The VE conceded that if the hypothetical individual needed to recline for 2 hours during the workday or would miss 3 workdays per month, competitive employment would be precluded. The VE also stated that a factor for discussion was Plaintiff's testimony that his "high level of pain for most of the day and his lack of energy precluded him from functioning above barely minimum even within his own home." (Tr, Pgs. 71-82).

## OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ concluded that Plaintiff has severe impairments of "lumbosacral degenerative disc disease that is status-post lumbar surgeries, chronic pancreatitis, insulin-dependent diabetes mellitus with peripheral neuropathy in the lower extremities and feet and an unspecified depressive disorder." The ALJ concluded

4

that:

> The claimant's back disorder does not produce the muscle loss, reflex loss, sensory loss or positive straight leg raise to an extent great enough to meet the criteria of Listing 1.04A. His diabetes has not produced the retinitis proliferans or acidosis needed to meet the criteria of that Listing. The claimant's pancreatitis does not produce the weight loss needed to meet the criteria of any Listing in the 5.00 section of the Listing of Impairments, and his hospital visits do not clearly show that his abdominal pain is even due to pancreatitis, as is shown in this decision. The claimant's depressive disorder does not produce functional limitations great enough to meet the criteria of Listing 12.04. No medical source has stated that the severity of the claimant's impairments medically equals a listed impairment.

## MEDICAL RECORD

The Plaintiff's extensive medical record begins with a letter from Kathleen Yang, M.D., the primary care physician, who has seen Plaintiff for a 5-6 year period at the rate of once per month. Dr. Yang expressed surprise that Plaintiff's claim for social security benefits was denied because she regards his pain as "debilitating." She described his impairments as "chronic back pain related to lumbar degenerative disc disease as well as four prior surgeries" and "painful peripheral neuropathy, related most likely to type 2 diabetes and chronic abdominal pain." Dr. Yang described her efforts at pain control and said that she was limited by the side effects of narcotics, Morphine and Oxycontin. Dr. Yang expressed the opinion that chronic back pain is not uncommon with patients having an underlying spinal disease and scar tissue resulting from prior surgeries. Dr. Yang did not limit chronic pain to only those patients with lumbar radiculopathy. She said that the peripheral neuropathy was treated with

5

Neurontin, but that her patient cannot tolerate a higher dose. Plaintiff's back and abdominal pain was treated with high doses of Fentanyl patches and Morphine Sulphate. She concluded: "at the current time with the current level of pain control that has been achieved with an acceptable level of side effects, he is certainly unable to sustain full-time work." Dr. Yang described Plaintiff as "compliant, reliable, and faithful" and stated that he has never smelled of alcohol or been intoxicated. (Tr., Pgs. 13-15).

Plaintiff was seen in the emergency room at Mercy Franciscan Hospital in February, 2001 for severe abdominal pain and nausea. He had a history of pancreatitis. An abdominal CT scan showed "some stranding around the pancreas, consistent with his previous pancreatic disease." He improved with the use of a "PCA pump to control abdominal pain" and was discharged with instructions encouraging a low fat diet and a referral to a gastroenterologist. (Tr., Pgs. 218-230). Plaintiff was again seen at Mercy Franciscan Hospital in April, 2001 for "acute, chronic pancreatitis" His treatment consisted of IV fluids, Morphine, Phenergan and Dilaudid. He was released in a stable condition. (Tr., Pgs. 233-237). Plaintiff was again seen at Mercy Franciscan in January, 2003 for "diabetic ketoacidosis and acute, chronic pancreatitis." Plaintiff denied recent alcohol and/or drug use, but his brother stated that Plaintiff "still drinks a couple of beers a week with his friends." He was hydrated, treated with an insulin drip and released to pursue a diabetic diet. (Tr., Pgs. 262-266).

Plaintiff was examined by Ali Arani, M.D., who specializes in internal medicine and cardiology, in July, 2003. Dr. Arani summarized his findings: "This is a 45-year-old man who has had a history of hypertension for five years, is controlled and has no end organ damage. His diabetes is insulin dependent and

6

has symptoms of diabetic neuropathy, although no detectable sensory changes could be identified. He has depression, mild degree, controlled with medication, although he attempted suicide and severe depression since 1994, taking different medications off and on. He has had multiple back surgeries for L4-5 disc, but continues having back pain with restricted range of motion with radiation to the left leg. He has chronic, recurrent pancreatitis with at least 12 hospitalizations for acute pancreatitis related to chronic alcoholism. His diabetes is insulin dependent since January, 2003 hospitalization when he had diabetic ketoacidosis. He has no restriction of sitting. He claims that standing more than half an hour, walking more than one block or climbing more than one flight of stairs makes his back stiff and painful. He cannot lift heavier objects than 5-10 lbs. He is oriented, able to maintain attention, concentrate, answer questions and handle his own benefits if granted." (Tr., Pgs. 291-293).

Plaintiff was evaluated by Deborah Southerland, Ph.D., a clinical psychologist, in July, 2003. Dr. Southerland diagnosed Plaintiff with Depressive Disorder and assigned a GAF of 60. Dr. Southerland's opinion was that Plaintiff was able to understand, remember and follow simple one and two-step directions and that his ability to perform simple, routine and repetitive tasks was not impaired, although his ability to understand, remember and carry out complex or detailed tasks was "mildly to moderately impaired." She also found "mildly to moderately impaired" his ability to attend, concentrate and persist, his ability to display appropriate work habits and his ability to get along with peers and supervisors. (Tr., Pgs. 293-301).

Augusto Pangalangan, M.D., an agency reviewing physician, reviewed the plaintiff's file and completed an RFC assessment in July, 2003. Dr. Pangalangan

7

opined that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently, could stand and/or walk for about 6 hours and sit for about 6 hours in a workday. Plaintiff displayed a normal gait and had no difficulty getting on and off the examining table. Range of motion was full in all joints, except the lumbar spine. Leg raising was positive at a 75 degree angle on the right and negative on the left. There were no sensory changes. (Tr. Pgs. 302-306).

Bruce Goldsmith, Ph.D., an agency reviewing clinical psychologist, reviewed Plaintiff's records and completed a Psychiatric review Technique form in December, 2003. Dr. Goldsmith noted that Plaintiff was diagnosed with a depressive disorder that "his speech is clear and of normal rate and tone, thought processes are logical, coherent and goal directed, mood and affect are appropriate. No psychomotor retardation or agitation is noted, no signs of anxiety, clinically appears to function in the low average to average range, limited insight and judgment. His reasoning ability and problem solving skills appear adequate. The claimant has no current mental health treating source and is on no medication." He rated Plaintiff as "moderately limited" in all categories of social interaction, in six out of eight areas in the category of sustained concentration and persistence and in 2 out of four areas in the category of adaptation. Dr. Goldsmith concluded that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures, the ability to understand and remember and carry out short and simple instructions, the ability to make simple work-related decisions, to be aware of normal hazards and take appropriate precautions and set realistic goals or make plans independently of others. Dr. Goldsmith opined that Plaintiff should not be subject to time or production pressures or work in close proximity to others. (Tr., Pgs. 307-322).

8

In August, 1990, a lumbar laminectomy and discectomy at L4-5 was performed by Stewart Dunsker, M.D., at Christ Hospital. Dr. Dunsker described the injured disc as "markedly bulging, but with an intact annulus." (Tr., Pgs. 324-325).

In February, 2002, Plaintiff was treated at Mercy Franciscan Hospital for abdominal pain and nausea associated with chronic pancreatitis. The treatment consisted of the administration of saline, Morphine Sulfate and Phenergan. (Tr., Pgs. 337-338). In March, 2000, Plaintiff was also treated at Mercy Franciscan Hospital for a "pancreatitis flare-up." This time he was treated with fluids, Pepcid, Demerol and Phenergan. (Tr., Pgs. 340-341). In December, 1999, Plaintiff was seen in the emergency room of Mercy Franciscan Hospital for stomach pain and because he needed refills of his medication. Dr. Boldt refused to refill his prescription for narcotics because a call to CVS Pharmacy indicated that Plaintiff had recently obtained Lortab, Oxycodone and Vicodin and, instead, referred him to the Pain Clinic and to a gastroenterologist. (Tr, Pgs. 343-344). In December, 1999, Plaintiff was again seen in the emergency room at Mercy Franciscan for abdominal pain. He was successfully treated with Toradol and Phenergan and released. (Tr., Pgs. 346-347).

In December, 1999, Plaintiff was again seen in the emergency room at Mercy Franciscan for abdominal pain. He was diagnosed with pancreatitis and treated with Demerol and a Phenergan push. (Tr., Pgs. 349-350). In November, 1999, Plaintiff was again seen at Mercy Franciscan for abdominal pain, for which he was treated with Demerol and Phengan and released. (Tr., Pgs. 352-353). In October, 1999, Plaintiff was again treated by an emergency room physician at Mercy Franciscan for abdominal pain. He was again given the typical treatment of

9

fluids, Denerol, Phengan, and Pepcid and released. (Tr., Pgs. 355-356). Another visit occurred in July, 1999 when Plaintiff reported abdominal pain and was diagnosed with "probable pancreatitis." (Tr., Pgs. 360-361). Plaintiff's additional three emergency room visits occurred in September and October, 1998 and February, 1999, each time for abdominal pain and each admission resulted in treatment and release. (Tr., Pgs. 363-370).

A CT scan of the abdomen in August, 1999 failed to show evidence of pancreatitis. (Tr., Pg, 378). An ultrasound in October, 1998, however did show "findings compatible with pancreatitis." (Tr., Pg. 380).

In September, 1998, Plaintiff was admitted to Mercy Franciscan Hospital with abdominal pain. The diagnosis was severe pancreatitis. He was discharged after a 3-day stay, during which he was treated with a intravenous Morphine, with instructions to quit drinking and join Alcoholics Anonymous. Dr. Cabigon was consulted for a possible hypertension problem. (Tr., Pgs. 411-412). In August, 1998, Plaintiff was also admitted for a six-day period at Mercy Franciscan for acute pancreatitis related to alcohol use. Because of the high level of Morphine required to ease Plaintiff's pain, Dr. Harlow (now Yang) suspected opiate abuse as well. He was discharged on a low dose of Oxycontin and referred to Narcotics Anonymous. (Tr., Pgs. 419-422). Plaintiff was seen in the emergency room of Mercy Franciscan in August, 2000 for abdominal pain. He was treated with Phenergan and Demerol and referred to Ralph Samlowski, M.D., a gastroenterologist, who diagnosed Plaintiff with "recurrent, chronic pancreatitis, most likely alcohol induced." (Tr., Pgs. 423-427).

A CT scan of the abdomen in August, 2000 showed "pancreatitis involving the tail of the pancreas with surrounding prominent soft tissue infiltration and

inflammatory stranding." (Tr., Pg. 432).

Plaintiff was admitted to Mercy Franciscan Hospital in December, 2001 for a seven-day period with a complaint of abdominal pain. Fluids were administered as well as Morphine, Stadol and Phengan. Pancreatitis was the discharge diagnosis. (Tr., Pgs. 449-453).

Dr. Yang completed an RFC assessment in April of 2003. She stated that Plaintiff could stand/walk for 2-7 hours and sit for 2 hours. She stated that Plaintiff could lift 5 lbs. frequently and 11-20 lbs. occasionally. Plaintiff's ability to push/pull and bend was "extremely limited," while his ability to reach was "markedly limited." In Dr. Yang's opinion, Plaintiff is "unemployable." Dr. Yang did not believe that Plaintiff had any limitations regarding his mental or emotional capacity to perform productive work. (Tr., Pgs. 465-467).

Plaintiff saw Martin McTighe at Beacon Orthopaedic for a physical ability assessment in October, 1998. Dr. McTighe felt that Plaintiff could lift and carry 10 lbs. on occasion, reach, stoop and kneel on occasion, but should avoid extreme cold, extreme humidity and vibration. "Carrying loads over 20 lbs. is contraindicated." (Tr., Pg. 471).

Plaintiff was seen at Clermont Mercy Hospital in January, 1999 for pancreatitis. He was hydrated with saline and given Morphine and Phenergan for nausea. He was advised to cease all alcohol consumption. (Tr., Pgs. 475-476). A similar visit occurred in February, 1999, at which time he was admitted and spent four days in the hospital for pancreatitis, probably related to alcohol consumption. (Tr., Pgs. 481-486). In March, 1999, Plaintiff spent five days at Clermont Mercy Hospital for pancreatitis. (Tr., Pgs. 491-506).

Mr. Isbel was evaluated in January, 2004 by Kathy Goyne, M.D., a

11

psychiatrist. Dr. Goyne diagnosed him with major depression and felt there was a "component of malingering" and that Plaintiff's "goal is to be taken care of by workers compensation." Dr. Goyne felt that Plaintiff had "a sense of entitlement." Dr. Goyne prescribed Zoloft and referred him for psychotherapy. (Tr., Pgs. 508-511).

Plaintiff had seven sessions with Harold Kelso, Ph.D., a clinical psychologist, for substance abuse treatment. Plaintiff conceded that he has been abusing drugs since the age of 13 and was advised to join either Alcoholics Anonymous or Narcotics Anonymous. (Tr., Pgs. 513-519). He was admitted to Providence Hospital, Psychiatric Department, in October, 1994 following a suicide attempt by overdosing on Darvocet. He was discharged four days later. The diagnosis was major depression, for which he was prescribed Welbutrin. (Tr., Pgs. 520-527).

Plaintiff saw Luis Pagani, M.D., at the Mayfield Neurological Institute in December, 1992, for nausea, vomiting and general weakness. He was treated for medication withdrawal and depression. (Tr., Pgs. 528-529). Dr. Pagani referred Plaintiff to the Bethesda Work Capacity Center for a conditioning program following treatment for low back pain. After completion of the 8-week program, the therapist reported that Plaintiff "continually made negative statements concerning his current situation and uncertain future, has not improved his ability to demonstrate appropriate workplace behaviors and has not improved his instructability and retention to perform work duties independently." Plaintiff was described as "over-focused on pain." The therapy team concluded: "The Team does not consider Mr. Isbel to be employable." (Tr., Pgs. 533-539).

An MRI of the lumbar spine was taken in November, 1995 at the

12

Wellington diagnostic Center. There was no evidence of a recurrent disc herniation, but "mild scar tissue" was identified. There were "end plate changes at L4 and L5 with peripheral discal enhancement." (Tr.. Pgs. 541-542).

The medical record contains multiple office notes from Dr. Pagani, who saw Plaintiff regularly from August, 1990 to October, 1995. Dr. Pagani's office notes reflect that Plaintiff reported "severe discomfort," and that his pain is in the lumbosacral region, radiating to the buttock and right leg. His neurological examination was normal, but he experienced muscle spasm and restriction of motion in all directions. As of June 10, 1993, Dr. Pagani's opinion was that Plaintiff was "100% disabled." Plaintiff was also treated for depression. (Tr., Pgs. 549-604).

The Claimant saw Rafael Ramirez, M.D., in January, 1997, following the laminectomy and bone fusion at L4-5, performed by Dr. Weimann and Dr. Ramirez. Plaintiff fell down steps after the surgery, but X-rays showed "no acute changes" and the "neurological examination was unremarkable." In December, Plaintiff was admitted to Franciscan Hospital with a "recurrent herniated disc at L4-5." (Tr., Pgs. 608-609). His third laminectomy on the same disc was performed. (Tr., Pgs. 610-611). In December, 1995, Plaintiff was admitted to Providence Hospital and taken to surgery for a recurrent herniated disc at L4-5. The laminectomy, Plaintiff's second, was performed by Dr. Ramirez. The first laminectomy was performed in 1990. (Tr., Pgs. 648-653).

Plaintiff saw Lester Duplichan, M.D., at the Mayfield Clinic in February, 2005 for chronic pain resulting from an injury in 1990 and subsequent laminectomies involving the L4-L5 and L5-S1 discs. A lumbar MRI showed "a right sided paracentral disc protrusion and scar tissue that appear to narrow in the

13

lateral recesses on the right of the L5 nerve root." Plaintiff displayed bilateral lower extremity symptoms (pain, numbness, tingling), despite a right-sided L4-5 disc protrusion. Dr. Duplican's diagnosis was "peripheral neuropathy." (Tr., Pgs. 682-710).

Dr. Yang completed a questionnaire in February, 2004 in which she indicated that in her opinion, Plaintiff's severe back and leg pain would cause him to miss work at a rate greater than three times per month. (Tr., Pgs. 710-711).

In January, 2002, Plaintiff was seen by Dr. Yang for chronic abdominal pain due to chronic pancreatitis. He was prescribed medications. (Tr., Pgs. 739-740). A similar visit was in December, 2001 and approximately once per month from September, 2000. During this period, Dr. Yang advised against the ingestion of alcohol and illegal narcotics, treated Plaintiff's abdominal pain and depression, and explored the possibility of a cholecystectomy. (Tr., Pgs. 740-798).

Plaintiff was seen by Stephen Martin, M.D., of the Pancreatic Disease Center in December, 2001. Dr. Martin was concerned that Plaintiff's spinal disease was the cause of his abdominal symptoms and if not, a laproscopic cholecystectomy would be advised. (Tr., Pgs. 801-802). An otherwise normal colonoscopy was done in June, 2001 with the exception of a "sessile polyp." (Tr., Pg. 803).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a

14

whole contains substantial evidence to support the Commissioner's decision. The
Commissioner's findings stand if they are supported by "such relevant evidence as
a reasonable mind might accept as adequate to support a conclusion." *Richardson
v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*,
305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are
supported by substantial evidence, the Court must consider the record as a whole.
*Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain
insured status requirements, be under age 65, file an application for such benefits,
and be under a disability as defined by the Social Security Act. 42 U.S.C. §§
416(1), 423. Establishment of a disability is contingent upon two findings. First,
plaintiff must suffer from a medically determinable physical or mental impairment
that can be expected to result in death or that has lasted or can be expected to last
for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).
Second, the impairments must render plaintiff unable to engage in the work
previously performed or in any other substantial gainful employment that exists in
the national economy. 42 U.S.C. § 423(d)(2).

Similarly, to qualify for SSI benefits, plaintiff must likewise file an
application and be an "eligible individual" as defined in the Act. 42 U.S.C. §
1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income,
and other financial resources. 20 C.F.R. § 416.202. To establish disability,
plaintiff must demonstrate a medically determinable physical or mental
impairment that can be expected to last for a continuous period of not less than
twelve months and plaintiff must also show that the impairment precludes
performance of the work previously done, or any other kind of substantial gainful

15

employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 CFR §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions,

16

the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 CFR §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen,* No. 87-6189, slip op. at 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985). Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work

17

considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Tayor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that

18

plaintiff can perform. *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of*

19

*H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

"In general, the opinions of treating physicians are accorded greater weight

than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walter v. Commissioner*, 127 F.3d 525, 529 (6th Cir. 1997); *Shelman*, 821 F.2d at 321.

## OPINION

Plaintiff's first assignment of error is that the ALJ gave undue weight to the

21

reports of other physicians instead of giving more weight to the reports of Dr. Kathleen Yang, Plaintiff's primary care physician. The ALJ stated in his written decision that he gave "consideration" to the reports of the state agency physicians, Drs. Pangalangan and Goldsmith, "little weight" to the opinions of Dr. Yang and Dr. Pagani, and "some weight" to the opinions of Drs. McTighe and Southerland. The ALJ does not mention how much weight was given to the opinion of Dr. Arani, but Dr. Arani's opinion was used to rebut that of Dr. Yang relative to the functional result of disabling pain; therefore Dr. Arani's opinion was, in reality, given more than some weight.

Dr. Kathleen Harlow changed her name to Yang upon her marriage sometime between September and October, 2001. It is apparent that Dr. Yang first met Plaintiff when she was a family practice resident at Mercy Franciscan Hospital in September, 2000. Dr. Yang continued to treat Plaintiff for the next 5 years. The ALJ chose to discredit Dr. Yang for two reasons, one of which is that she incorrectly stated on Paragraph 4 of a form entitled "Request for Limited Medical Data," and submitted to her by Hamilton County Jobs and Family Services that Plaintiff was declared eligible for social security benefits effective in 1996. The form submitted to Dr. Yang contained the statement that "The patient was determined by Social Security to be eligible for benefits effective" and then there appeared on the form a blank space to fill in a date. Dr. Yang filled the blank space by writing the year "1998" and then expressed her opinion that Plaintiff became disabled two years previous in 1996. The fact is that Plaintiff had never been declared disabled and unable to work by the Social Security Administration.

Although Dr. Yang probably fills out numerous forms for insurance companies, lawyers and government entities, the mistake is more likely the result of mis-

22

communication with her patient than with any intent to mislead and may be explained by Plaintiff's receipt of benefits from some entity other than the Social Security Administration. In any event, the misstatement has little to do with Dr. Yang's medical judgment and couldn't be a substantial reason for discrediting her opinion.

The second reason for discrediting Dr. Yang's opinion is that the "medical record does not support such an assessment." The ALJ's statement is supported by references to an EMG of February 24,2005, done at the direction of Dr. Duplichan at the Mayfield Spine Institute. The findings resulting from that EMG showed "a mixture of demyelination and axon loss - moderate" and "no electrodiagnostic evidence suggestive of lumbar radiculopathy, polyradiculopathy or sciatic neuropathy." The conclusion was that "electrodiagnostic findings are most suggestive of peripheral neuropathy affecting the distal bilateral lower extremities."

Dr. Yang, however, did not limit her evaluation of Plaintiff's pain to radicular symptoms. Dr. Yang referred to the cumulative effect of chronic back pain related to lumbar disc disease and four prior surgeries, peripheral neuropathy actually suggested by the EMG of February 24, 2005 and chronic abdominal pain. Dr. Yang made it very clear that chronic pain was not limited only to those patients displaying radiculopathy. To conclude that because there was no substantial proof of radiculopathy that Plaintiff has no disabling pain is simply medically incorrect and not a basis, in and of itself, to discredit Dr. Yang.

However, the ALJ finds further support for his determination that Dr. Yang's opinion be given "little weight" in the findings of Drs. Arani and Duplichan. Dr. Duplichan, a neurosurgeon, examined Plaintiff at the request of Dr. Yang. Dr. Duplichan's examination showed that lumbar flexion and extension produced back pain and some loss of sensation in the right leg, but that there was negative straight

23

leg raising and normal range of motion in the hips, knees, and ankles as well as excellent bulk, strength and tone in the lower extremities. Dr. Duplichan's review of Plaintiff's MRI showed the prior laminectomies at L4-5 and L5-S1 and that there was a disc protrusion and scar tissue near the L5 nerve root. Although the EMG results suggested peripheral neuropathy in February, 2005, Dr. Duplichan concluded that Plaintiff suffered from lumbar radiculopathy in April, 2005 and suggested the use of a spinal pump for chronic pain. Dr. Duplichan provided his medical impressions to Dr. Yang, who was the referring physician and she considered them in reaching her conclusion that Plaintiff's pain was "debilitating." Dr. Yang did not base her conclusion solely on the basis of Plaintiff's lumbar situation. She also considered Plaintiff's peripheral neuropathy and pancreatitis.

Dr. Arani's practice is internal medicine, which is very similar to Dr. Yang's specialty of family practice. Both specialties routinely serve as primary practice physicians and are generalists, rather than specialists. In any event, in July. 1973, Dr. Arani found that Plaintiff had a normal gait and no difficulty getting on or off the examining table. Dr. Arani also found that Plaintiff had a full range of motion in all joints except the lumbar spine, which he found to be moderately to severely reduced, and he also found positive straight-leg raising on the left. Dr. Arani thought Plaintiff's neuropathy to be caused by his diabetic condition and also found his pancreatitis to be chronic, recurrent and caused by alcoholism. Dr. Arani opined that Plaintiff had no sitting restriction, but could not lift heavier objects than 5-10 lbs. Considering the fact that Plaintiff was 6'2" tall and weighed 204 lbs. at the time, the lifting restriction was rather significant. Our assessment is that the scope of concern of both Dr. Arani and Dr. Yang was broader than that of Dr. Duplichan as both listed pancreatitis as one of the factors causing Plaintiff's abdominal pain whereas Dr.

24

Duplichan's focus was on Plaintiff's spine.   We do not, however, find the inconsistencies to be of impeaching value as did the ALJ.

Dr. Pagani's opinion was afforded "some weight."  Dr. Pagani, a neurosurgeon at Mayfield Neurological Institute, treated Plaintiff for approximately 5 years from November, 1990 to November, 1995.  Dr. Pagani's treatment began shortly after Plaintiff was injured while lifting an object on a landscaping project and seen at the Emergency Room at Christ Hospital soon thereafter.  Dr. Pagani initially prescribed Darvocet, physical therapy and traction, but eventually recommended a laminectomy by Dr. Dunsker.  The laminectomy was followed by anti-inflammatories the use of a TENS unit, a work hardening program and a referral to the Pain Clinic, as well as injectable Toradol for pain.  Dr. Pagani recognized that Plaintiff was also suffering from depression and recommended psychiatric treatment and prescribed anti-depressants.

In November, 1994, Dr. Pagani reported that Plaintiff overdosed on Darvocet, "is totally unable to function from his chronic pain and depression," has reached maximum medical improvement, and is "permanently and totally disabled for gainful employment."  Dr. Pagani referred Plaintiff to Drs. Kahn and Roberts, orthopaedic surgeons, for a second opinion relative to Plaintiff's spinal impairments. As a treating physician with a longitudinal history with Plaintiff and as a specialist in the field of neurosurgery, Dr. Pagani's opinion should have been given more than "some weight."

Dr. McTighe is an orthopaedic surgeon, practicing with Beacon Orthopaedic and Sports Medicine. Dr. McTighe, whose opinion was afforded "some weight," saw Plaintiff four times from September 21, 1998 to November 10, 1998.  The reason Plaintiff consulted Dr. McTighe was for neck pain following an automobile accident. Dr. McTighe imposed a 10 pound weight limit for occasional lifting and said that

Plaintiff could occasionally stoop and kneel. Dr. McTighe provided samples of Arthrotec, a narcotic, for pain and referred him to his internist for treatment of his pancreatitis or abdominal pain.     The ALJ observed, and we agree, that his conclusions regarding Plaintiff's residual functional capacity were quite similar to those of Dr. McTighe, thus demonstrating that Dr. McTighe's conclusions were, in reality, afforded more than "some weight." However, as a treating physician who saw Plaintiff a limited number of times and for an unrelated condition, Dr. McTighe's opinion should have been afforded "some weight."

In summary, the two physicians who had the most contact with Plaintiff, Dr. Yang, the family practice physician for 5-6 years and Dr. Pagani, the Mayfield neurosurgeon and the specialist, both concluded that Plaintiff was disabled. Their opinion was supported by the team of physical therapists at the Bethesda Work Capacity Center in 1992. Dr. Pagani's concurrence with Dr. Yang's opinion gives it considerable weight. Affording Dr. Yang's opinion "little weight" is error.

The second error assigned by Plaintiff's counsel is that the ALJ misevaluated Plaintiff's credibility and subjective reports of pain.  The ALJ's supports his conclusion that "the objective  medical evidence does not support allegations of disabling back pain" by reference to Dr. Arani's examination and Dr. Arani's findings in 2005 that Plaintiff had a normal gait, had no difficulty getting on or off the examining table, had no sensory changes and his legs showed excellent bulk, strength and tone. The EMG in 2005 showed no proof of radiculopathy. However, Dr. Arani reported positive straight leg raising on the right and so did Dr. Pangalangan in 2003. Conspicuously absent in this analysis, however, are a number of indicators pointing in the opposite direction. One is the fact that Dr. Yang reported that Plaintiff was taking Morphine and Oxycontin as well as Fentanyl patches and Neurontin and could

26

not tolerate higher doses because of the side effects. Dr. Yang was attempting to balance tolerable pain with negative side effects in attempting to control Plaintiff's pain, which she did not limit to Plaintiff's disc problem, but included his peripheral neuropathy and chronic pancreatitis. Dr. Pagani found no neurological problems in 1993, but he also found muscle spasm and restriction of motion in all directions. It is undisputed that Plaintiff made multiple (more than a dozen) visits to the emergency room for pancreatitis attacks and that the typical treatment was the infusion of intravenous Morphine, reflecting a great deal of pain, albeit temporary, because Plaintiff was typically treated and released in the emergency room without being admitted to the hospital.

It is also undisputed that there is an objective basis for Plaintiff's subjective reports of pain. He has had four surgeries on his low back and scar tissue, first identified by an MRI in 1995, again was noted near the L5 nerve root by another MRI in 2005. There is some dispute over the cause of Plaintiff pancreatitis. Dr. Arani thought it was caused by chronic alcoholism, but Dr. Martin suggested that it might have been caused by Plaintiff's degenerative disc disease. The cause of Plaintiff peripheral neuropathy does not seem to be in dispute. Drs Yang and Arani viewed it as being caused by Plaintiff's diabetes. There is no dispute that both pancreatitis and peripheral neuropathy are typically associated with a certain degree of pain.

Plaintiff, however, as the ALJ describes, has some credibility issues. Plaintiff has a history of alcohol and substance abuse and has not always been forthright either in his disclosure of the problem or in responding to treatment recommendations. Dr. Coyne, the psychiatrist, suspected him of malingering and he has been in chemical dependency treatment several times and been terminated by several physicians for noncompliance with treatment. To be fair, his substance abuse problems were at their

27

worst during the mid 1980s to the mid 1990s. After that period of time, the only hint of a continuing problem was his brother's statement to emergency room personnel at Mercy Franciscan Hospital in April, 2001 that Plaintiff "still drinks a couple of beers a week with his friends." Dr. Yang was Plaintiff's treating physician from the year 2000 forward and stated that she had no evidence that Plaintiff continued to drink or abuse drugs.

We have no quarrel with the ALJ's being quite suspicious of Plaintiff's pain to the extent that it depends on Plaintiff's subjective reports and cannot find that his analysis was erroneous. However, there were objective factors that can be taken either way. There is an objective basis for severe pain, yet there are no sensory deficits or muscle atrophy. In such a case, the opinions of treating sources, especially ones with a longitudinal experience with the patient, become paramount.

The third Statement of Error criticizes the ALJ for failing to include functional limitations in his hypothetical question aimed at accommodating Plaintiff's depression. We disagree with this criticism. First, and as the ALJ points out, Plaintiff did not list depression as an impairment when he filed his application for benefits. Second, Plaintiff own testimony at the hearing disclosed that his depression was not as bad as it was in the early 1900s, that the suicidal thoughts and crying spells have ceased and that he was currently taking antidepressants. Plaintiff listed difficulty concentrating and remembering as functional impairments resulting from his depression. Neither Dr. Southerland nor Dr. Goldsmith was able to detect any functional impairment related to Plaintiff's ability to remember and both Dr. Southerland and Dr. Goldsmith rated Plaintiff's ability to concentrate as moderately impaired. Any possible mistake in this area was accommodated by the types of jobs identified by the Vocational Expert because none of them would require an extreme

28

level of concentration.

The fourth and last Statement of Error is that the ALJ erred by his failure to include the days Plaintiff would miss work because of severe back and leg pain. The source of this contention is Dr. Yang, who responded to a questionnaire in February, 2004 that in her opinion, Plaintiff would miss work at a rate greater than three times per month coupled with the Vocational Expert's testimony that missing work at the rate of three times per month would render a person unemployable. There is no direct testimony or other direct evidence in the record. The only way the ALJ could disregard this opinion of Dr. Yang was to give "little weight to her opinion." Under the facts and circumstances of this case, this was error.

This is not a case where a finding of disability was clearly indicated by the record, but is a case where an independent medical opinion should be sought. The question on remand should be whether or not Plaintiff's cumulative pain from his previous four surgeries plus the scar tissue which has developed from same, pain from pancreatitis and from peripheral neuropathy is sufficiently debilitating to render him disabled.

**IT IS THEREFORE RECOMMENDED THAT** this case be **REVERSED AND REMANDED** to the Commissioner, pursuant to Sentence Four of 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.

Timothy S. Hogan
United States Magistrate Judge

29

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**ROGER D. ISBEL,**
       **PLAINTIFF**

**CASE NO. 1:06-cv-384**
**(WATSON, J.)**
**(HOGAN, M.J.)**

**VS.**

## COMMISSIONER OF SOCIAL
## SECURITY,
       **DEFENDANT**

### NOTICE

Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on             . Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).